J-S22004-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE MATTER OF:  K. M.-A. A/K/A K. S. M.-A., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  R. M., FATHER | No. 3451 EDA 2017 |

Appeal from the Order September 28, 2017
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):
51-FN-00654-2016
CP-51-AP-0000500-2017
CP-51-DP-0001221-2016

| | |
|---|---|
| IN THE INTEREST OF:  L. M.-A. A/K/A L. M. M.-A., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  R. M.-A., FATHER | No. 3456 EDA 2017 |

Appeal from the Order September 28, 2017
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):
51-FN-00654-2016
CP-51-AP-0000501-2017
CP-51-DP-0001222-2016

BEFORE:  BENDER, P.J.E., STABILE, J., and PLATT,[*]

MEMORANDUM BY BENDER, P.J.E.:                    **FILED JUNE 08, 2018**

R. M.-A. (Father) appeals from the September 28, 2017 orders that granted the petitions filed by the Philadelphia Department of Human Services (DHS) to involuntarily terminate his parental rights to K. M.-A. (born in

_____

[*] Retired Senior Judge assigned to the Superior Court.

November of 2008) and L. M.-A. (born in November of 2007) (collectively Children).[1] Additionally, the goals for Children were changed to adoption. We affirm.

In its opinion, the trial court initially sets forth an extensive procedural history of this case. It then discusses the testimony provided at the termination hearing, which encompasses much of what was delineated in the procedural history portion of the opinion. We reproduce that portion of the opinion, which discusses the evidence presented at the termination hearing.

> On September 28, 2017, this [c]ourt held Contested Termination of Parental Rights Hearings and Goal Change Hearings for both Children. Mother, S.C.S., attended and was represented by counsel.[2] Father, R. M.-A., attended and was represented by counsel.
>
> Ms. Caitlyn Dunston, counsel for DHS called the first witness to testify, Nadia Seum, CUA [(Community Umbrella Agency)] Case Manager Supervisor for Turning Points for Children. She testified[,] stat[ing] she has been the Case Manager Supervisor for these Children since they came into care on June 20, 2016. She stated the two Children were in the care of Maternal Aunt and Uncle at the time because the Grandmother had passed away and [] Children went to the Maternal Aunt and Uncle by a family arrangement outside of DHS involvement approximately one year prior.
>
> Ms. Seum testified that prior to the Maternal Grandmother['s] caring for [] Children, they were under the care of Father, R. M.-A. Father was arrested in May of 2014, and [] Children were cared for by the Father's girlfriend for a short period

_____

[1] Father's appeals were consolidated by this Court *sua sponte* by order, dated December 12, 2017.

[2] Mother's parental rights were involuntarily terminated following the hearing, but she has not filed an appeal.

of time. Then, they were cared for by Maternal Grandmother, and finally came into the care of the current caretakers, the Maternal Aunt and Uncle in May of 2015. DHS became involved in June 2016 and [] Children were adjudicated Dependent and have been continuously in the care of the Maternal Aunt and Uncle since then.

Ms. Seum testified that [] Child, L. M.-A., made allegations of sexual abuse perpetrated by her paternal uncle [R.B.] and requires individual therapy through Child Guidance Resource Center. She noted that the Maternal Aunt and Uncle are also involved with [] Child's therapy.

She further testified that Father, R. M.-A., was incarcerated at the time [] Children were placed by DHS. The parental objectives for Father were to complete parenting classes, and later, upon release from prison, to have him participate in ARC services and mental health services. She noted Father never contacted the Agency until he was released from prison in June 2017, and he telephoned. Father stated he completed parenting classes in prison, however, he did not provide confirmation or proof of the completion.

Ms. Seum testified that from the time Father contacted her agency in June 2017 until today at the court hearing, Father had not provided an address or contact information. Today he did provide his address. He did request to visit his Children, however, [] Children did not want to see their Father. She noted the last contact Father made with the agency was July 2017.

On cross-examination, Ms. Seum noted that Mother was given as an objective to obtain domestic violence counseling because [] Children's Father, R. M.-A., had been physically abusive to her. She noted there was no evidence that Father had been abusive to his Children, however, [] Children spoke about how they felt when their Father was aggressive. Finally, she stated [] Children's caretakers, Maternal Aunt and Uncle, indicated that Father had no contact with his Children.

Rashana Rivera, CUA Case Manager, Turning Points for Children, was the next witness to testify. She stated she last saw [] Children in the home of Maternal Aunt and Uncle on September 19, 2017, and they were safe with all their needs being met. [] Children were excited to show her their room because they had never had their own room before. They appeared very

comfortable in the home they share with their sibling, K.I.T.W.[3] Both Children stated they would like to remain in the home. L. M.-A. refers to her Maternal Aunt and Uncle as Mom and Dad, while K. M.-A. changes his reference to them as Mom and Dad, and also as Auntie and Uncle. Ms. Rivera asked [] Children whether they wanted to visit their Father, and L. M.-A. told her she did not want to visit with him at this time. K. M.-A. stated he would not mind visits with his Father.

Ms. Rivera testified she does not believe there is a parent-child bond between [] Children and their Father, and opined they would not suffer irreparable harm if Father's parental rights were terminated. She further opined that adoption would be in the best interest of both Children to remain with the maternal aunt and uncle. She noted [] Children have been in their home for a long time, and they have a parental relationship with their aunt and uncle. They are stable and loved in their current home.

On cross-examination by Kathleen Knese, G[ua]rdian Ad Litem, Ms. Rivera noted that Maternal Aunt and Uncle have attended therapy with [] Children, and had paid tuition in a private school for [] Children. [] Children have since transferred to a charter school and they no longer pay tuition in a private school.

[] Father was the next witness to testify. He stated he had full legal custody of [] Children from approximately 2010 until he was incarcerated on November 13, 2014. He further noted that he has other [c]hildren and had offered them a stable home and up-to-date medical care up until he was incarcerated.

Father testified he was unaware his Children were in DHS custody until he got notification of the last court date, and he was in prison the entire time. He pled guilty to drug charges and was incarcerated. He then found out the custody of the Children was given to the Maternal Grandmother, S.S., in Family Court.

Father stated he was aware of the parental objective for him to receive parenting classes, and he presented two Certificates from parenting classes he completed while in prison. He further stated he was in communication with Mr. Leon and Ms. Daniels to

_____

[3] K.I.T.W. (born in December of 2013) is Mother's child with a different father, whose parental rights were also terminated.

- 4 -

attempt to get visits with his Children, which was another parental objective, however, he was told to wait until [] Children's lawyer was contacted, which did not occur. He also stated he was told he would have to wait until the [c]ourt hearing on June 5, 2017 to discuss visitation with his Children, however he never attended the hearing. Father further claimed to have contacted Ms. Daniels immediately after his release from prison on June 23, 2017 and he talked to her regularly until she left the agency. He noted he gave her his address....

Father states he has been employed full-time at Target since July 28, 2017, and has rented a three bedroom house where he lives with his wife and a younger son. He desires to be reunited with his Children and be involved with their lives. He does not want to necessarily take them out of somewhere where they are comfortable. In response to the testimony from the Case Worker that his Children do not want to see him, Father noted that their Mother painted a bad picture of him to everyone and once he is back in their lives, they will change their mind. Father claimed there was no domestic violence issues between him and [] Mother, however, he did admit that at one point, there had been a Stay Away Order against him from [] Mother.

On cross-examination by Kathleen Knese, Guardian Ad Litem, Father noted that he recently was in jail as a result of a parole violation. He also admitted he had two convictions for selling drugs. Father further stated he did not believe that L. M-A. was sexually abused by his brother.

Trial Court Opinion (TCO), 1/11/18, at 9-14 (citations to the notes of testimony omitted).

The court then set forth the law relating to the termination of parental rights. Based upon its findings derived from the testimony it found credible, the court ordered the termination of Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2) and (b) and changed the goal for each child to adoption.

In his brief, Father raises the following issues for our review:

1. Whether the trial court erred by terminating the parental rights of [F]ather pursuant to 23 Pa.C.S.[] [§] 2511(a)(1) without clear and convincing evidence of [F]ather's intent to relinquish his parental claim or refusal to perform his parental duties.

2. Whether the trial court erred by terminating the parental rights of [F]ather pursuant to 23 Pa.C.S.[] [§] 2511(a)(2) without clear and convincing evidence of [F]ather's present incapacity to perform parental duties.

. . .

5. Whether the trial court erred by terminating the parental rights of [F]ather pursuant to 23 Pa.C.S.[] [§] 2511(b) without clear and convincing evidence that there is no parental bond between [F]ather and [C]hildren and that termination would serve the best interest of [] [C]hildren.

Father's brief at 7.[4]

We review an order terminating parental rights in accordance with the

following standard:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

---

[4] We have not included issues #3 and #4, which relate to 23 Pa.C.S. § 2511(a)(5) and (a)(8), because the trial court did not terminate Father's parental rights under those two subsections.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (quoting *In re S.H.*, 879

A.2d 802, 805 (Pa. Super. 2005)). Moreover, we have explained that:

> The standard of clear and convincing evidence is defined as
> testimony that is so "clear, direct, weighty and convincing as to
> enable the trier of fact to come to a clear conviction, without
> hesitance, of the truth of the precise facts in issue."

*Id.* (quoting *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

The trial court is free to believe all, part, or none of the evidence presented

and is likewise free to make all credibility determinations and resolve conflicts

in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). If

competent evidence supports the trial court's findings, we will affirm even if

the record could also support the opposite result. *In re Adoption of T.B.B.*,

835 A.2d 387, 394 (Pa. Super. 2003).

We are guided further by the following: Termination of parental rights

is governed by Section 2511 of the Adoption Act, which requires a bifurcated

analysis.

> Our case law has made clear that under Section 2511, the court
> must engage in a bifurcated process prior to terminating parental
> rights. Initially, the focus is on the conduct of the parent. The
> party seeking termination must prove by clear and convincing
> evidence that the parent's conduct satisfies the statutory grounds
> for termination delineated in Section 2511(a). Only if the court
> determines that the parent's conduct warrants termination of his
> or her parental rights does the court engage in the second part of
> the analysis pursuant to Section 2511(b): determination of the
> needs and welfare of the child under the standard of best interests
> of the child. One major aspect of the needs and welfare analysis
> concerns the nature and status of the emotional bond between
> parent and child, with close attention paid to the effect on the child
> of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511, other citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *R.N.J.*, 985 A.2d at 276.

With regard to Section 2511(b), we direct our analysis to the facts relating to that section. This Court has explained that:

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id*. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id*. at 763.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

As noted above, the trial court terminated Father's parental rights pursuant to section 2511(a)(1), (2) and (b). In order to affirm, we need only agree with the trial court as to any one subsection of section 2511(a), as well as section 2511(b). *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). As noted previously, Father's brief provides argument regarding four subsections of section (a), two more than relied upon by the trial court. We have chosen to address and analyze the court's decision to terminate Father's parental rights under section 2511(a)(1) and (b), which provide:

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\*\*\*

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).

In **In re Z.P.**, 994 A.2d 1108 (Pa. Super. 2010), this Court provided direction relating to what considerations need to be addressed when reviewing a trial court's decision to terminate parental rights under various subsections of 2511(a). Specifically, relating to subsection (a)(1), the **Z.P.** Court stated:

A court may terminate parental rights under Section 2511(a)(1) where the parent demonstrates a settled purpose to relinquish parental claim to a child **or** fails to perform parental duties for at least the six months prior to the filing of the termination petition. **In re C.S.**, [761 A.2d 1197 (Pa. Super. 2000)]. The court should consider the entire background of the case and not simply:

mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by

> the parent facing termination of his … parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.
>
> ***In re B.,N.M.,*** 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied,* 582 Pa. 718, 872 A.2d 1200 (2005) (citing ***In re D.J.S.,*** 737 A.2d 283 (Pa. Super. 1999)).

***In re Z.P.***, 994 A.2d at 1117 (emphasis in original).

In his argument relating to subsection (a)(1), Father contends that he "never failed to perform his parental duties, nor has he indicated a settled intent to relinquish his parental rights." Father's brief at 11. He asserts that he "frequently and consistently" contacted Children while he was incarcerated, that he sent cards and letters to Children, and that he requested that Children visit him in prison, but that these requests were not honored. Thus, Father claims that DHS "did not make reasonable efforts toward reunifying [] [C]hildren with [F]ather." ***Id.*** Essentially, Father argues that his "inability to perfectly satisfy the goals and objectives of his family service plan was caused by a lack of reasonable efforts by [DHS]…." ***Id.***

In addition to the previously-quoted, extensive recitation of the facts of this case, the court provided additional discussion relating to subsection 2511(a)(1) and (2), stating:

> Case Manager, Nadia Seum, CUA Case Manager for Turning Points for Children[,] testified credibly that the Children were not in Father's care when the placement occurred and that he was incarcerated. She has been the Case Manager Supervisor for these Children since they came into care on June 20, 2016. She stated the two Children were in the care of maternal aunt and uncle at the time because the Grandmother had passed away and

- 10 -

[] Children went to the Maternal Aunt and Uncle by a family arrangement outside of DHS involvement approximately one year prior.

This [c]ourt heard credible evidence regarding Father's failure to perform parental duties, and inability to remedy the conditions which led to [] Children's removal and placement. Ms. Seum testified the parental objectives for Father were to complete parenting classes, and later, upon release from prison, to have him participate in ARC services and mental health services. She noted Father never contacted the Agency until he was released from prison in June 2017, when he telephoned.

Father, on the other hand, provided testimony that was not persuasive and found to be incredible by this Court. Father did provide two Certificates of completion of parenting classes from the prison. However, this Court reasoned the evidence is clear and convincing that although Father may have appeared to have accomplished one of the goals set forth, none of it has resulted in any enhanced stability to recognize what his Children have been subjected to, and what their needs are. Father did admit the Children were now safe and stable in the home of the Maternal Aunt and Uncle and he does not want to disrupt that situation.

This [c]ourt is not persuaded that Father can or will remedy the conditions which brought [] Children into [c]ourt supervision. Nor is the [c]ourt persuaded that Father will be able to fulfill his parental responsibilities in the future.

TCO at 17-18.

Likewise, with regard to Father's argument relating to subsection 2511(b), he contends that he and Children have a strong emotional bond in that he raised them from infancy until he was incarcerated in 2014. He further asserts that he "frequently and consistently attempted to arrange visits with [] [C]hildren, only to be constantly denied by [DHS]." Father's brief at 14. Father directs his complaint of an inability to strengthen the bond between him and Children on the failure of DHS "to make reasonable efforts toward

- 11 -

reunification." *Id.* However, the trial court, as noted above, found that Children were dependent upon and bonded with Maternal Aunt and Uncle, that they were safe with all their needs being met, that no bond existed between Children and Father, and that "they would not suffer irreparable harm if Father's parental rights were terminated." TCO at 19.

Our thorough review of the record reveals that the trial court did not abuse its discretion in ordering the termination of Father's parental rights. The record supports the court's findings and conclusion that Father's refusal or failure to perform parental duties occurred for a period of at least six months prior to the filing of the petition. In fact, since Father's incarceration, which occurred before DHS's involvement in this matter, he has refused or failed to perform parental duties. Moreover, the evidence shows that Children have bonded with Maternal Aunt and Uncle, who satisfy their needs in a stable and loving home. Additionally, we note that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *In re Z.S.W.*, 946 A.2d 726, 732 (Pa. Super. 2008) (citation omitted). "[A] parent's basic constitutional right to the custody and rearing of [his or her] child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d at 856. Since Father has not convinced us otherwise, we conclude that he is not entitled to any relief.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/8/18